If you want to reserve time, just watch your clock. Good morning, Your Honors, and if it please the Court, I am Kim Sherman, the attorney for Student J.S., and I would like to reserve three minutes of my time for rebuttal. This case is about a young child born with disabilities that affected his abilities to manage his mental health and behavioral challenges and interfered in his abilities to interact safely and appropriately with peers and adults. When dysregulated, this child was unable to engage in academic learning. The Oregon District Court committed four reversible errors of law related to discrimination under Section 504, placement in the least restrictive environment during the 2018-2019 school year, which includes the IDEA requirement to maintain a continuum of placement options, whether removal of key program components of mental health and behavioral services was a change in placement, and a parent's right to receive transcription of the due process hearing at no cost. At the end of the arguments, I will ask this Court to decide the issue of IDEA, Free Appropriate Public Education, and Section 504, Free Appropriate Public Education, separately from the Section 504 discrimination question at heart. And I ask that the Court rule that an hour a day of education was discriminatory, even if the District implemented a student's IEP during the one hour per day of instruction. Even if this Court decides that the District's IEP was appropriate during September to November of 2018, or through December 18th of 2018, when the parents requested more time in education or enrollment in a daycare program so he would have access to peers, this Court must find that for the great majority of the seven months this child waited on a wait list for placement in the appropriate setting of a day treatment center, that homebound instruction for one hour per day was discriminatory under the ADA and under Section 504. I have one factual question. I think in your briefs you say the student could study for 90 minutes at a time, but the District Court said the student could study 90 minutes per day. What's in the record? Is it 90 minutes a day, 90 minutes at a time you could take a break? You're correct, Your Honor. On November 16th at the IEP meeting that placed the child on the wait list, parents said at that time that he was so dysregulated that he could only handle 90 minutes at a time of direct instruction. So does that mean per day, or it means he needs a break and then could do it? 90 minutes at a time. The District offered five hours spread out over, I think it was three days, so less than two hours a day, but not every day was the first offer. Later it was amended to be six hours a week over three or four days. So at that time, the student's dysregulation from his engagement in the Fox Hollow 4J program after the removal of the mental health and behavioral support services, he began self-harming. He was depressed. He was self-loathing. He felt like he didn't deserve to go to school. And the parents were worried about his mental health and his physical health at that point. So under the Section 504 and the ADA, school districts are required to provide access to their program in a way that is comparable to the access provided to non-disabled students. Under Section 504, the requirement for a free appropriate public education begins to overlap with the IDEA's free appropriate public education. But IDEA's free appropriate public education is defined in a document called the IEP, the under which the district has said, here are the goals and objectives that will help this child gain skills in the academic or functional deficits for so many minutes of the day. And it defines who will be providing those specially designed instruction minutes. So an IEP might represent only 10 or 20 percent of a school day, where Section 504 represents the entire school day. Discrimination happens when either the IEP is inappropriate, as we claim here, and or the rest of the school day is not available to the student. That's the issue here, and that's the issue that both the Administrative Law Judge and the Oregon District Court misanalyzed when the District Court said, because the child has an IEP, there is no discrimination under 504, ignoring Office of Civil Rights' guidance that even 10 minutes a day of excusing children early or letting them come late was a represented discriminatory practice against children with disabilities. The second issue relates to the least restrictive environment. Under the IDEA, the Oregon District Court error of law was in determining that the district was not required to have available at the time of the placement decision, so in November of 2018, a full range of alternative placement options, that's called the continuum of placement requirement under IDEA at Section 300.115. This requirement is to have that continuum is the least restrictive environment. On November 16th, when the parents had a choice of either returning their child to the Fox Hollow 4J program without the needed mental health and behavioral support services, or be on a wait list until the actual placement was available, which is placement in a day treatment center, they had no real choice, because their child was self-harming and had suicidal ideations at that point, so they chose the wait list. The district will claim that that placement on the wait list during the homebound instruction was the least restrictive environment because the student made progress on academic goals. However, the issue here actually relates to the specially designed instruction in behavioral, social, and emotional goals, and those goals required access to peers, required the student to learn to wait his turn when another peer was seeking attention from a teacher, and required interaction with peers for social skills and turn-taking and just managing himself in the environment of a classroom. None of those goals could be addressed sitting across the table in his grandfather's house from a one-on-one tutor. Yes, he made academic goals. He had none of those other things interrupting his ability to focus on academics, but the IDEA, Section 504, and the ADA don't look at just academic access. They look at the whole child and the child's access to the whole school program, which includes lunch, recess, music, passing from class to class, after-school sports or drama. All of those pieces of a school program should be available to children with disabilities, but for this child, because of his disability, he was denied access to that full day of school. What's the significance of the fact that perhaps maybe the parents didn't agree with what the school was proposing, but in the end, for many of these complaints, the parents agreed to them in the IEP? How do we treat that? I'm not sure I heard you. Sure. What is the significance of the fact that the parents may have agreed with many of the things you complain of now in the IEP? How should we treat that fact? Well, Your Honor, in March, at an IEP meeting, parents wrote on the placement page that although they agree with the goals in the IEP, they did not agree that the placement in homebound instruction was providing the child full access to a full day of school and his rights under Section 504. So it's possible, Your Honor, to have an IEP that has appropriate goals written, and the parents can agree to those goals, and the goals on this child's IEP included academic as well as social, emotional, and behavioral goals. In fact, the IEP in April stated that because of this child's mental health and emotional disabilities that he could not be educated in a general education classroom, and that when he was dysregulated, he was unable to engage in academic instruction. So an IEP might look great, and parents will agree with the goals, and during the one hour a day or five hours a week of instruction, a tutor might be able to instruct the student appropriately on the academic goals. But because of this setting, the child didn't have access to peers and wasn't able to develop skills in those social, emotional, and behavioral goals. The third area of disagreement was when the Oregon District Court determined that the change from the mental health program, which included embedded mental health and behavioral supports in the Fox Hollow Education Service District program during second and third grade, that removing those supports was not a change in placement. The district argued that case law allows a change of staffing. This was not a change of staffing, this was a removal of services. It wasn't that there was mental health service from Ms. Smith on third grade and Ms. Jones in fourth grade. Instead, it removed Ms. Smith totally. There's evidence that this child required mental health and behavioral support services because of the change in his abilities from first grade, then in second and third grade with those supports, improvement, then fourth grade without those supports, dysregulation and regression in those skills. And finally, the fourth area... You have about two and a half minutes, so just... Okay. Thank you. If you want to continue, you can, but I just want to alert you to that. I'll address the transcription costs and rebuttal. Great. Thank you. Thank you. Good morning, and may it please the court. I am Joel Hungerford, and I represent the defendant, Eugene School District, in this case. With me today is my co-counsel, Taylor Kinch, along with the representative of the Eugene School District, Dr. Catherine Lange. I would like to begin my argument by addressing Judge Lee's two previous questions about how the factual record plays into this case. I would like to begin by starting the question about whether the parent represented during the November 2018 IEP meeting how much time the student could tolerate academically at that point in time. The record is uncontested that the parent shared with other members of the IEP team that at that point in time, she did not believe the student could maintain more than 90 minutes of academic instruction at a time. The IEP team took that to mean 90 minutes per day. At the administrative due process hearing, the administrative law judge specifically asked individuals who attended that IEP meeting why the team did not decide more than one hour per day. Why not eight hours per day? Why not four minutes per day? Four hours per day? And staff consistently testified. One example I can think of is Dr. Linder, one of the expert witnesses for the school district, testified that it was the team's understanding that the student could not do more than 90 minutes per day. But if it's 90 minutes per day, that would still be seven and a half hours a week, and you only provided five hours a week. That's not that much at all. Yes, Judge. If the team had done 90 minutes per week, it would have been more than what ultimately the team decided. However, it's not uncommon for IEP teams to decide to start with a slower approach and ramp up, rather than to set a student up for failure by trying to overtax a student. A school district might, as was the case here, start with a lower number and then increase as time goes on. And that's precisely what happened here. So in the November IEP meeting, the team decided, rather than starting with 90 minutes a day, we'll start with one hour a day. Ten days later, the student's father emailed the school district, noting that he believed that amount of time was addressing all of the student's academic needs, though he did have concerns about whether the student's behavioral and social needs were still being met. So the school district reconvened the IEP team in December, at which point in time the amount of time was increased to six hours per week, as opposed to five hours per week. I then want to segue into Judge Lee's question about how a parent's agreement at the time of an IEP meeting is relevant, whether it's relevant or not. And I would argue that it is highly relevant under both this Court's previous precedent and also under our U.S. Supreme Court precedent. This Court, on multiple occasions, including Anchorage School District v. MP 689, F3rd 1047, which is the Ninth Circuit case from 2012, noted that the decisions of an IEP team should not be judged with the benefit of hindsight. Rather, the IEP team's actions should be judged by whether the decision was reasonable at the time it was made based on the information that the team had. And courts since then have noted that whether a team reaches unanimous agreement or consensus, whether the parents agree at that point in time, does weigh heavily into the conclusion that the IEP team's decision was reasonable at that point in time. The U.S. Supreme Court has reiterated on multiple occasions that under the IDEA, reviewing courts should conduct a two-factor analysis first. Where the procedures of the IDEA followed in this situation, there is no allegation that those IEP teams were not convened appropriately, that services were predetermined, that the IEP team did not contain all of the relevant and necessary team members, that notice was not sufficiently provided, that the IEP was not sufficiently documented, etc. And then the second factor that the U.S. Supreme Court has noted that reviewing courts should take into consideration was, again, was the IEP reasonably drafted to confer a meaningful benefit to the student at the time it was written? And again, parent agreement with the plan moving forward is a large indicator that such a plan was reasonable at the time it was drafted. I assume you're headed there, but I have some questions about the transcription cost issue. The way that I read the proceedings below, it seems like all the students' Section 504 claims were based on the denial of a FAPE. And so I'm trying to figure out why under that kind of a basis for the apportionment. Certainly, Your Honor. So one thing that is uncontested in this case is under the IDEA, plaintiffs have the right to receive a copy of the transcript at no cost. Also not contested in this case is under Section 504, plaintiffs have no such right. What this Court is addressing today is what happens in a situation where a plaintiff brings both IDEA claims and Section 504 claims, as was the situation here. In that situation, I would say that it becomes a review of whether the administrative law judge abused his or her or their discretion in coming up with a calculation to address that issue. It may very well be that an administrative law judge might review the specific facts of the case and note the Section 504 claims are FAPE claims that are so intertwined with the IDEA FAPE claims that it does not make sense to have the plaintiff pay for any of these. I think the Federal regulation is clear that there can't be a transcription cost for a transcript under the IDEA. So if the claims are entirely coextensive, which it seems they are here, it seems to me it would be an abusive discretion to hold that there could be a cost for the Section 504 portion. There is no Section 504 portion that's freestanding in these circumstances. So I guess what would be helpful to know is if you think that there are any 504 claims here that were not premised on the denial of the FAPE. No, that's a contested issue. It's the school district's argument that all Section 504 claims were, in fact, Section 504 FAPE claims. But I do understand from plaintiff's briefing that they are taking a different argument in this case. And so I want to talk through a few different hypotheticals for how an administrative law judge might address a situation such as this. And then my administrative law judge may very well take the approach that Your Honor has noted, noting that the claims are so interwoven, so intertwined, it would not be — it would not serve the purposes of the IDEA or Section 504 to have the plaintiff cover any of those costs. An administrative law judge might also say, I will take the entirety of the record under advisement, and I will consider all of the evidence and all of the testimony, and in my final order, I will try and parse out what percentage of the case was focused exclusively on the 504 claims. Because if a plaintiff brings both IDEA and Section 504 FAPE claims, the plaintiff not only needs to meet the IDEA standard to be successful, but then the plaintiff must, in essence, show a mens rea standard in order to meet the Section 504 threshold, which is deliberate indifference. So an ALJ might note, well, even if the Section 504 FAPE claims are duplicative of the IDEA claims, some of the testimony related to what staff knew or didn't know, why they were not providing the services that they needed to provide, et cetera, et cetera, and so in that situation, because most of the testimony really was driven at proving the IDEA claims, but, you know, a portion of the testimony related to what was the mens rea of the school district administrators at this point in time that a smaller percentage should be covered. So, again, in this situation, the administrative judge looked at the number of 504 claims, the number of IDEA claims, and came up with a calculation for, well, how can I come up with a percentage where the school district bears the entirety of the cost for the IDEA claims and evenly splits the cost for the Section 504 claims? Again, another administrative law judge might have done it differently, but the question for this Court is whether the administrative law judge abused her authority in coming up with the calculation that she did. I would like to move on. I think that that's a logical step into talking about whether or not the Section 504 claims were FAPE claims in this case or whether they were discrimination claims found outside Section 504's FAPE provision. As I've noted previously, the school district's position is that all of the Section 504 claims were, in fact, FAPE claims, not stand-alone separate discrimination claims, and there are a few different ways that the Court could get there. First, I want to note how the plaintiff is describing the Section 504 discrimination claim, and I would point to the most recent brief filed with this Court, the reply brief at page 15, where the plaintiff includes a subsection titled, District's placement in a shortened day was discriminatory, and then immediately goes on to state, here, student's Section 504 discrimination claims related to a shortened school day are distinct claims related to the sufficiency of the district's IEP. Again, there are multiple ways that the Court could come to the conclusion that that Section 504 claim was, in fact, a FAPE claim, not a separate and stand-alone discrimination claim. I am going to put forth three different ways that the Court could come to that conclusion, one, comparing that claim against the IDEA FAPE claims, two, looking at the plain language of Section 504's FAPE standard, and then three, applying the analysis previously provided by the Supreme Court in Frye v. Napoleon Community Schools. Looking at the administrative complaint itself, on pages 24 to 25, where the plaintiff is setting forth the IDEA FAPE claims, there's paragraph 112, which reads, District further failed to provide students a free, appropriate public education, FAPE, in the least restrictive environment during the 2018-2019 school years, when, after students' IEP team determined that the 4J Fox Hollow program did not meet students' needs, District failed to have available an alternative full-day school placement designed to serve students with behavioral challenges, and instead required students to attend home instruction for five to six hours per week while being placed on a wait list for the child center, end quote. So even comparing the language of how the plaintiff characterizes the Section 504, quote, discrimination claim against the IDEA FAPE claim, they are virtually identical, which makes for an illogical conclusion that although the same nucleus of facts, the same description of the action from the school district is under the IDEA FAPE allegation, but under Section 504 is not a FAPE allegation. Next, turning to the plain language of Section 504, Section 504's FAPE requirement is found at 34 CFR 104.33, and if you read subsection B, subsection 1, it defines an appropriate public education and states, for the purpose of this part, the provision of an appropriate education is the provision of regular or special education and related aids and services that are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met, and two, are based upon adherence to the procedures that satisfy the requirements of Sections 104.34, 104.35, and 104.36, end of Section 504 itself notes that FAPE relates to the, quote, provision of regular or special education, and here, end quote, and here, that's precisely what Plaintiff is arguing the student was denied when the student received fewer hours of regular education instruction while attending homebound instruction. If I could just go back, you had mentioned the child center and the question of whether the government complied with its obligation to provide a full continuum of alternative placements. I guess, according to the record, the child center had a well-known history of long wait lists. I mean, it'd be one thing if, you know, at certain points, the child center has wait lists because there are a lot of students, but it seems like this is a perennial problem. Everybody knows this, that there's a huge wait list. I mean, why does that satisfy the government's obligation when you know this child center is always overbooked and there will always be a wait list? I would like to address that in two parts. First, I would like to kind of note that it's well established that IDE courts are courts of equity. Here, both the administrative law judge and the district court noted that the wait list was not an issue caused by the school district itself. The administrative law judge in particular noted that she would have a hard time finding that the district violated its obligations when it could not change the wait list. Yeah, but maybe they look at other alternatives. Like, that's a problem. If you know something has a huge wait list, let's see other alternatives. And I think that that segues into the second part I want to address, which is the facts of this case. Here, the school district did not just make an application to the child center. The district, the evidence in the record is that the parents came to the November IEP meeting saying, we've already talked to the child center. We would like this student to go there. And the school district said, we can move forward with that. But we know historically they've had a wait list of six to 12 months. So what the school district said was, if we are going to go down that path, which we can do, but if we are going to do that, it's going to be a two-step process of an interim placement until that becomes available. Secondly, the school district did not make an application just to the child center. There were two other day treatment programs within a reasonable driving distance of the Eugene School District that they also made applications to. And so here in this situation, the school district said, there are three day treatment programs that are practically available to the student. We will make applications to all of them. If the child center is the first one that becomes available, if that's the parents preferred, we'll go there. But if one of the other two become available first, we are happy to place the student there as well. And I see I'm beyond my time. I'd be happy to answer any follow-up questions you might have, though. Great. Thank you. Thank you. I'd like to start with the last question first. Yes, the school district knew that not only the child center, but the other two programs that Mr. Hungerford just referenced had wait lists. And instead of creating a program as they had when the student was in first grade and also on a wait list for one of those three programs, when the district created this program with the ESD to embed mental health and behavioral supports into a school district program and made that available to the student, they could have done the same thing in fourth grade. They could have taken some of the resources that they admitted still existed within the district, mental health providers, behavioral support service providers, and embedded those back into the program. Everybody at the November 16th meeting agreed that the child center or a program like that was appropriate because of the mental health and embedded behavioral support services. The district failed to have that continuum of placement options available. Section 504 doesn't permit a district to absolve itself of its responsibilities just because a contracted program is full or discriminatory. The district has that obligation. Regarding the transcription costs, Mr. Hungerford spoke about the ALJ's right to provide a transcription and make decisions in equity and that she made a reasoned calculation of what the transcription costs. The ALJ does not have, however, the opportunity to subvert federal statutes. The federal statutes state that under IDEA, nothing under the IDEA can be, can deny the parent a right under any of the other federal laws like the ADA and Section 504. And our own Oregon Administrative Rules in the section that describes the rights of parents in a due process hearing talk about two things that are not available. One is a transcription at no cost to the parents, and the other is a stay put order. So if a parent has a claim under both the IDEA and a separate state order, but related claim under Section 504, Mr. Hungerford's reasoning would be that stay put is not available to a child who brings a claim under a due process hearing. That can't be the way that that statute is read. In addition, because the IDEA requires parents to exhaust at the administrative level all related claims, these parents were required to bring their 504 claims. If we maintain the ruling of the administrative law judge in the district court, parents who have claims under both IDEA and Section 504 ADA must now separate their 504 claims from their IDEA claims and face an exhaustion dismissal later when they bring their 504 claims or fork over almost $10,000 or more for transcription costs. Again, that can't be the way that that statute is read. I think you've exceeded your time. Great. Thank you. Thank you both for the helpful argument. The case has been submitted.
judges: LEE, VANDYKE, THOMAS